IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JAMES V. ADAMS, | ) | |
| | ) | No. 32012-0-III |
| Respondent and | ) | |
| Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | |
| OF CORRECTIONS, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Both parties to this Public Records Act (PRA)[1] dispute appeal

decisions of the Franklin County Superior Court, which concluded that the Washington

State Department of Corrections (DOC) improperly withheld records that inmate James

Adams requested from his offender file, acted in bad faith in doing so, and should pay a

penalty of $24,535. The DOC challenges the conclusion that it acted in bad faith. Mr.

Adams argues that the penalty awarded was insufficient and was arrived at without full

consideration of all of the relevant evidence.

The trial court found that the DOC's position that the documents were subject to

an exemption from disclosure was legally indefensible and that the DOC simply deferred

---

[1] Chapter 42.56 RCW.

to what it was being told by individuals with the Washington State Patrol, without engaging in any critical analysis of its own. It found that the intentional bad faith character of the DOC's decision to withhold the documents was further demonstrated by the DOC's persistence, after a Spokane County Superior Court squarely rejected any claim of exemption, in continuing to rely on views of the state patrol that it preferred over the views of the court. We hold that "bad faith" for purposes of imposing penalties under RCW 42.56.565(1) includes an agency's failure to engage in any serious independent analysis of the exempt status of documents it withholds. For that reason, and because Mr. Adams fails to demonstrate any error in his cross appeal, we affirm all of the decisions of the trial court.

## FACTS AND PROCEDURAL BACKGROUND

James Adams is incarcerated at the Coyote Ridge Corrections Center, a facility operated by the DOC. In July 2011, Mr. Adams submitted a request to the corrections center's records unit to review his inmate central file. Among other documents included in an offender's central file is his criminal conviction record packet. That packet consists of criminal history obtained from the Washington State Patrol and the Federal Bureau of Investigation (FBI) at the time the inmate's fingerprint cards are forwarded following his admission to DOC custody. It also includes updated information obtained as part of the DOC's annual review thereafter. Updated information for the packet is obtained by submitting the inmate's name and date of birth into ACCESS, an acronym for "A Central

2

Computerized Enforcement Service System," which is the Washington State Patrol's telecommunications system providing linkage to law enforcement and other criminal justice agencies. *See* WASHINGTON STATE PATROL, http://www.wsp.wa.gov/crime/isbhome.htm (last visited Aug. 12, 2015).

In response to Mr. Adams's record request, a corrections center records manager reviewed his file and removed documents she believed were exempt from disclosure under the PRA, including Mr. Adams' 23-page criminal conviction record packet. The first two pages of Mr. Adams's packet were a Defendant's Case History Report. The remaining 21 pages were printouts from ACCESS. The ACCESS printouts included information on Mr. Adams from Washington State, from the FBI, and from the Interstate Identification Index System, a "cooperative federal-state system for the exchange of criminal history records." 28 C.F.R. §20.3(m).

The records manager completed a "Denial of Disclosure of Public Records" form dated July 14, 2011, that stated in pertinent part:

1. TO: ADAMS, JAMES

2. YOUR REQUEST FOR DISCLOSURE OF THE RECORDS IDENTIFIED BELOW HAS BEEN DENIED TO THE EXTENT AND FOR THE REASON(S) SET FORTH BELOW.
. . . .
SPECIFIC INTELLIGENCE AND OR INVESTIGATION RECORDS *FBI & SID[2] RAP SHEETS; CCR PACKET*

---

[2] "SID" is the acronym for "state identification number."

3

Clerk's Papers (CP) at 343. There was no identification of how many pages of documents were being withheld or any more specific description of their contents.

When Mr. Adams reviewed the portion of his central file produced on that same day, he was presented with the "denial of disclosure" form, which he signed. Later that day, the records department sent Mr. Adams the following explanation for its withholding:

> EXEMPTION(S) II [sic]—FBI RAP AND WASHINGTON STATE RAP SHEET—These records, consisting of the Federal Bureau of Investigation Rap Sheet and/or the Washington Rap Sheet, are protected from disclosure and have been withheld in their entirety per the following citations: . . . [citing 28 CFR § 513.11(a)(1), 28 CFR § 513.20(b), and RCW 4.56.070(1)].

*Id.* at 289.

Mr. Adams appealed the withholding of his state and federal criminal information to the DOC's Public Disclosure Appeals Office, arguing that he was exempt "from all of the above-mentioned citations that would necessarily deny my review of my own FBI and SID RAP Sheets." *Id.* at 404. The appeals office denied his appeal. It again cited 28 CFR § 513.11(a)(1), 28 CFR § 513.20(b) and RCW 4.56.070(1), quoting in part from each, and also stated that "[n]on-conviction criminal history information is for law enforcement use only, and restricted from dissemination under provisions of *RCW 10.97.050 and 28 USC § 534 and 28 CFR Part 20.*" CP at 406. The denial letter advised Mr. Adams to contact the WSP and the FBI directly, explaining that "these

entities can create and provide official copies of FBI Rap Sheets and Washington State Rap Sheets, respectively." *Id.*

*Commencement of the PRA action*

Mr. Adams commenced this action in Franklin County shortly thereafter, on October 31, alleging that the DOC violated the PRA in responding to his request.

Three days before Mr. Adams filed his complaint, the Spokane County Superior Court had entered a memorandum decision in an action entitled *David Chester v. Department of Corrections*, in which Mr. Chester "alleg[ed] violations of [the PRA] as several groups of public records (criminal rap sheets) belonging to [Mr. Chester] were withheld from production and inspection or review during [his] central file reviews on June 17, 2010, and June 7, 2011." CP at 57 (Memorandum Opinion and Order, Cause No. 11-2-00329-3 (Oct. 28, 2011)). At Mr. Chester's request, the court had reviewed in camera a number of documents withheld from Mr. Chester by the DOC, including six pages of Mr. Chester's own Washington State Patrol rap sheet dated April 2002, six pages of his state patrol rap sheet dated May 2006, eight pages of his state patrol rap sheet dated February 2002, and two pages of his FBI rap sheet dated April 2002.

The Spokane court's decision stated that "[a]fter an additional review of potentially applicable exemptions, . . . it does not seem that Plaintiff's [requested records, WSP and] FBI rap sheets, are exempt under any provision." *Id.* at 59. The court ordered

5

the DOC to provide Mr. Chester with copies of his state and FBI rap sheets, among other documents. The DOC moved for reconsideration, which the court denied in November.

Almost 10 months later, on September 4, 2012, DOC filed a motion for a show cause hearing to resolve Mr. Adams's PRA complaint. It conceded that it violated the PRA by withholding the two-page Defendant's Case History report during Mr. Adams's offender central file review the year before. But it argued that the remaining 21 pages of documents had been withheld based on its signed user agreement with the state patrol and its understanding that the state patrol (at least at one time) viewed dissemination of ACCESS printouts to inmates as sanctionable misuse of the system.

The DOC filed declarations of the correctional records manager for the DOC and the Coyote Ridge records supervisor that undercut its position in part, since they admitted that the state patrol had "modified its position" with respect to state patrol rap sheets on January 10, 2012, and now took the position that the ACCESS use agreement was not violated by allowing an offender to inspect his or her own Washington State rap sheet information. According to the declarations, federal and out of state rap sheet information remained nondisclosable.

The Coyote Ridge records supervisor further stated in her declaration that in light of the state patrol's changed position, she had scheduled a time on August 23, 2012, for Mr. Adams to review pages one through 11 of his packet, consisting of the Defendant's Case History document and the Washington State portion of the ACCESS printout. She

stated that although Mr. Adams appeared at the scheduled time, he refused to review the records.

In its motion to dismiss, the DOC persisted in arguing that it did not violate the PRA in withholding ACCESS printouts because state and federal law prohibited it from providing Mr. Adams's FBI and WSP rap sheets to him. It persisted in claiming that its position was supported by requirements of the state patrol's ACCESS Standard Procedures and its 2009 and 2011 user agreements, unsigned copies of which it provided to the court.

*Show Cause Hearing*

The trial court found the DOC's justification for its withholding indefensibly deficient. At the hearing of the show cause motion, it pointed out that DOC's legal support for its position was limited to a state patrol records section manager's conclusory declaration as to applicable law, regulation, policy, and federal-state agreement. The court stated it had been unable to locate a single document or legal citation provided by DOC that prohibited the DOC from disseminating an offender's state patrol or FBI rap sheet to that offender. The court asked the DOC's lawyer three times during the hearing to draw the court's attention to any record evidence of an edict or agreement that prohibited the offender from being provided with the ACCESS printouts. None was identified.

7

After hearing the parties' argument, the trial court serially addressed the state patrol's ostensible authority on which the DOC relied in refusing to provide Mr. Adams with the ACCESS printouts from his central file. It explained why each authority fell short of supporting the DOC's withholding of the records. Finding no basis for exemption, the trial court concluded that the DOC had violated the PRA.

The court found the record inadequate to determine whether the DOC withheld the records in bad faith, warranting a penalty. It ordered the DOC to submit additional briefing together with copies "of any and all agreements it may have" with the state patrol, FBI, or other state or federal agencies regarding the information obtained through ACCESS, "as well as any specific policies, manuals, or correspondence between the agencies that substantiates the statements made in [the state patrol section manager's] declaration [in support of the show cause motion]." CP at 292.

### Penalty hearing

The DOC proved unable to produce any consequential additional support substantiating its position. It produced none that predated its withholding of Mr. Adams's records in July 2011.

It did produce electronic mail communication that began in December 2011, in which representatives of the DOC sought clarification or support for its position from the state patrol and FBI. A February 1 letter from the DOC's correctional records manager to the Division Commander of the state patrol's Criminal Records Division stated that the

8

DOC had withheld rap sheets based on unidentified "previous advice" and was "seek[ing] clarification." CP at 270. Rather than discuss the PRA or any other applicable law, the DOC employee simply asked the state patrol's division commander what he thought the parties' user agreement required.

The Division Commander's response pointed out that the DOC had two agreements with the state patrol. As to the first, the user agreement for ACCESS, the Division Commander expressed no opinion on its dissemination provisions. As to the second, a user agreement for fingerprint-based Washington rap sheets, the Division Commander stated that for DOC to provide a copy of such a rap sheet to the rap sheet's subject "would not breach the [automated fingerprint modification system] user agreement with the WSP." *Id.* at 275.

With this scant support for the DOC's actions in hand, the trial court looked to the mitigating and aggravating factors identified in *Yousoufian v. Office of Ron Sims*, 168 Wn.2d 444, 229 P.3d 735 (2010) (*Yousoufian* 2010) to aid assessment of the culpability of an agency that has violated the PRA. Applying those factors, the court found no statutory basis for the DOC's withholding ACCESS printouts from the subject of the report, that the DOC's position was "legally indefensible," and that the agency's choice to solicit the opinions of the state patrol and FBI rather than engage in its own critical examination of applicable law (including failing to heed the decision in *Chester*) demonstrated bad faith. It concluded that a substantial penalty was necessary to deter

9

future misconduct. It ultimately imposed a penalty of $35 per day from the date of Mr. Adams's request to the date of the penalty hearing, for a total of $24,535.

Both Mr. Adams and the DOC moved for reconsideration. The requests for reconsideration were denied. Both parties appeal.

## ANALYSIS

The DOC filed the first notice of appeal and assigns error to the trial court's finding that it acted in bad faith. Mr. Adams assigns error to the trial court's allocation of the burden of proving bad faith to the record requester and to the trial court's alleged failure to consider evidence relevant to the penalty. We first address the DOC's appeal and then turn to Mr. Adams's.

## DOC APPEAL

The DOC identifies three issues by segregating its actions on which the trial court relied into three categories: (1) its actions in withholding the portion of the ACCESS printouts that reflected information from the Interstate Identification Index (III) System, (2) its actions in withholding the portion that reflected Washington State information, and (3) its failure to heed the superior court decision in *Chester*. Br. of Appellant at 1-2. After addressing the meaning of "bad faith" in this context and the standard of review, we will address the issues as presented by the DOC.

The PRA "is a strongly-worded mandate for broad disclosure of public records." *Rental Hous. Ass'n of Puget Sound v. City of Des Moines*, 165 Wn.2d 525, 535, 199 P.3d

393 (2009) (citing *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978)). It requires that state and local agencies "produce all public records upon request unless a specific PRA exemption or other statutory exemption applies." *Robbins, Geller, Rudman & Dowd LLP v. State*, 179 Wn. App. 711, 719-20, 328 P.3d 905 (2014); RCW 42.56.070(1). "[T]he agency claiming the exemption bears the burden of proving that the documents requested fall within the scope of the exemption." *Cowles Publ'g Co. v. Spokane Police Dep't*, 139 Wn.2d 472, 476, 987 P.2d 620 (1999).

"When an agency withholds or redacts records, its response 'shall include a statement of the specific exemption authorizing the withholding of the record (or part) and a brief explanation of how the exemption applies to the record withheld.'" *City of Lakewood v. Koenig*, 182 Wn.2d 87, 94, 343 P.3d 335 (2014) (quoting RCW 42.56.210(3)). "The purpose of the requirement is to inform the requester why the documents are being withheld and provide for meaningful judicial review of agency action." *Id.* (citing *Progressive Animal Welfare Soc. v. Univ. of Washington*, 125 Wn.2d 243, 270, 884 P.2d 592 (1994) (*PAWS II*); *Sanders v. State*, 169 Wn.2d 827, 846, 240 P.3d 120 (2010)). It is improper under the PRA to provide exemption information in such vague terms that "the burden [is] shifted to the requester to sift through the statutes cited . . . and parse out possible exemption claims." *Lakewood*, 182 Wn.2d at 95.

11

*Limitations on Inmate Recovery of Penalties*

As an inmate at the time he made his public record request, Mr. Adams is subject

to a limitation on penalties adopted by the legislature in 2011. LAWS OF 2011, ch. 300,

§ 1. Under RCW 42.56.565(1),

> A court shall not award penalties under RCW 42.56.550(4) to a person who
> was serving a criminal sentence in a state, local, or privately operated
> correctional facility on the date the request for public records was made,
> unless the court finds that the agency acted in bad faith in denying the
> person the opportunity to inspect or copy a public record.

By adding the bad faith requirement, "the legislature increased the level of culpability

needed for an award to an inmate" from the expansive range of culpability that can give

rise to a penalty where the requester is not incarcerated. *Faulkner v. Dep't of Corrs.*, 183

Wn. App. 93, 105, 332 P.3d 1136 (2014) *review denied*, 182 Wn.2d 1004 (2015).

Legislative committee reports suggest that the underlying bill was introduced as a

measure to "curb abuses by inmates." *Id.* "By incorporating the bad faith requirement,

the legislature allows penalties for inmates only when the conduct of the agency defeats

the purpose of the PRA and deserves harsh punishment." *Id.* at 106.

The DOC does not challenge the trial court's ruling that a PRA violation occurred

nor does it challenge the amount of the penalty arrived at by the court—it challenges only

the trial court's threshold finding that it acted in bad faith.

Two decisions by this court following the 2011 amendment of RCW 42.56.565(1)

have considered what constitutes bad faith within the meaning of that provision. In

12

*Francis v. State Department of Corrections*, 178 Wn. App. 42, 54, 313 P.3d 457 (2013), *review denied*, 180 Wn.2d 1016 (2014), Division Two of our court rejected the DOC's assertion that "an agency acts in bad faith only when it knows that it has responsive records but intentionally fails to disclose them." Instead, it held that "among other potential circumstances, bad faith is present under RCW 42.56.565(1) if the agency fails to conduct a search that is both reasonable and consistent with its policies." *Id.* at 63 n.5.

In *Faulkner*, this court held that bad faith in the PRA context "incorporates a higher level of culpability than simple or casual negligence," and is "associated with the most culpable acts by an agency." 183 Wn. App. at 103, 105. Accordingly, to establish bad faith, an inmate "must demonstrate a wanton or willful act or omission by the agency." *Id.* at 103. Citing *Black's Law Dictionary* 1719-720 (9th ed. 2009), the court explained that "wanton" means "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." *Id* at 103 (alteration in original) (internal quotation marks omitted). And "wanton"

> differs from reckless both as to the actual state of mind and as to the degree of culpability. One who is acting recklessly is fully aware of the unreasonable risk he is creating, but may be trying and hoping to avoid any harm. One acting wantonly may be creating no greater risk of harm, but he is not trying to avoid it and is indifferent to whether harm results or not.

*Id.* at 103-04 (internal quotation marks omitted) (quoting BLACK'S LAW DICTIONARY 1720 (9th ed. 2009)).

13

"Whether an agency acted in bad faith under the PRA presents a mixed question of law and fact, in that it requires the application of legal precepts (the definition of 'bad faith') to factual circumstances (the details of the PRA violation)." *Francis*, 178 Wn. App. at 51-52.

The DOC does not assign error to the trial court's factual findings supporting its determination of bad faith. Accordingly, these findings are verities on appeal. *State v. Rankin*, 151 Wn.2d 689, 709, 92 P.3d 202 (2004). Whether those facts support its conclusion that the DOC acted in bad faith, on the other hand, is a question of law that this court reviews de novo. *Faulkner*, 183 Wn. App. at 101-2 (citing *Francis*, 178 Wn. App. at 51-52).

The court made the following findings relevant to its conclusion that DOC acted in bad faith:

- "DOC's explanation for noncompliance is not reasonable" [Finding 5];

- "[T]he DOC was not completely forthcoming in its initial explanation as to why it was withholding the records, wherein it stated there was a statutory basis for withholding the rap sheets, when in fact there was no statutory basis for the DOC, the Washington State Patrol or the FBI to withhold Mr. Adams'[s] criminal records" [Finding 6];

- "[T]he Court finds DOC's position legally indefensible, that there is no statute that prohibits the dissemination of rap sheets, either state or federal, that the DOC was undaunted by this fact, that one government agency cannot rely upon and point to another

14

governmental agency where that governmental agency's decision-making process is clearly in error" [Finding 11];

- "[T]he Court finds that the DOC actions are clearly intentional and in bad faith[;[3] t]he DOC was not relying on any statutory exemption or basis but simply relying upon the opinion of someone in another agency, and prior to this case coming to this court, Judge Eitzen, of the Spokane County Superior Court, under Cause No. 11-2-00329-3, had already found the DOC in violation of the Act on these grounds" [Finding 12];

- "The Court also finds that no indication that the [DOC] has filed an interlocutory appeal or that it has filed a declaratory action. The Court further finds bad faith where the DOC, a department within the executive branch of government, has chosen to ignore decisions made by the judicial branch regarding rap sheet dissemination. [None of t]he DOC, the WSP []or the FBI are privileged to ignore judicial decisions; [Finding 12];

- "[T]he Court finds that a substantial penalty is necessary, and, in respect to the separation of powers issue, the executive branch of government is required to follow the decisions that are properly within the authority of the judicial branch of government. The Court further finds that the existence of other legal remedies are available to the DOC and that the DOC cannot simply ignor[e] judicial decisions as occurred herein" [Finding 16].

CP at 30-32.

With these undisputed findings in mind, we turn to the three issues as identified by DOC.

---

[3] As discussed, we treat "bad faith" as a conclusion of law. *See Grundy v. Brack Family Trust*, 151 Wn. App. 557, 567, 213 P.3d 619 (2009) (conclusions of law mislabeled as findings of fact are reviewed as what they are, de novo).

15

*Withholding of Interstate Identification Index Criminal History*

The DOC argues that standing alone, an agency's reliance on an invalid basis for nondisclosure is not a basis for finding bad faith, although it concedes that reliance on a "'farfetched'" basis for nondisclosure may result in such a finding. Br. of Appellant at 13 (quoting *King County v. Sheehan*, 114 Wn. App. 325, 357, 57 P.3d 307 (2002)). While not assigning error to the trial court's finding that its position proved to be indefensible, it provides a ten-page discussion of federal law (mostly federal regulations) to show that the issue of whether federal law prohibits a state criminal agency from disclosing rap sheet information on an inmate, to that inmate, "is not as simplistic as the trial court held." Br. of Appellant at 13. In short, it seeks to show that its position was not "farfetched."

The discussion begins with what the DOC views as its most defensible withholding of documents: its withholding of ACCESS printouts reflecting information from the III System. While it referred to all of the withheld documents as "rap sheets" at the time of withholding, it now distinguishes information from the III System from what it calls fingerprint-based rap sheets and contends that unlike fingerprint-based rap sheets, III System information cannot be disseminated by a law enforcement agency to the individual who is the subject matter of the information. It misconstrues federal rules that not only permit, but require, that inmates have an opportunity to review their own criminal history record information and a United States Supreme Court holding that

16

federal law only requires restricting *third party* access to a person's rap sheet information.

As the DOC concedes, 28 U.S.C. § 534(b) was the key provision on which the state patrol mistakenly relied in concluding that providing criminal record information from FBI-controlled systems to the subject of that information was prohibited. 28 U.S.C. § 534(b) states that "[t]he exchange of records and information authorized by subsection (a)(4) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies."

Over 40 years ago, the director of the FBI announced rules under which the subject of rap sheet information was free to obtain a copy of that information maintained by the FBI pursuant to 28 U.S.C. § 534. The rules were explained as follows:

> By order dated September 24, 1973, the Attorney General of the United States directed that the . . . FBI[] publish rules for the dissemination of arrest and conviction records to the subjects of such records upon request. This order resulted from a determination that 28 U.S.C. 534 does not prohibit the subjects of arrest and conviction records from having access to those records.

Department of Justice Order No. 556-73, 38 Fed. Reg. 32,806 (Nov. 28, 1973). The announcement went on to explain that the rules would provide a procedure by which the records could be obtained from the FBI. It also explained that it was able to announce the rules without following rulemaking procedure under the federal Administrative Procedure Act "because the material contained herein relates to the interpretation of 28

U.S.C. 534 as allowing the granting of an exemption to subjects of identification records," and "it is deemed in the public interest that there be no delay in the effective date of availability of identification Records to the subjects thereof." *Id.*

Sixteen years later, the United States Supreme Court discussed the FBI's position in *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989), the seminal authority on 28 U.S.C. § 534 that the trial court relied upon in concluding that the DOC had violated the PRA. In *Reporters Committee*, the Supreme Court considered whether subsection 534(b) made the FBI's criminal history information exempt from disclosure under the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552. Three steps in the Supreme Court's reasoning and its holding are fatal to DOC's argument that 28 U.S.C. § 534(b) prohibited it from providing Mr. Adams with copies of his FBI rap sheets.

In *Reporters Committee*, a news reporter and an association of journalists requested FBI rap sheets of members of a family associated with organized crime. The district court for the District of Columbia found that the records were exempt from disclosure under FOIA; the Court of Appeals of the District of Columbia reversed in a split decision and then denied rehearing en banc, with four judges dissenting. The U.S. Supreme Court then granted certiorari.

The Supreme Court's decision recounted the history of the FBI's collection and sharing of rap sheet information, observing that before 1957, the Department of Justice,

18

as a matter of executive policy, had generally treated rap sheets as confidential. 489 U.S. at 752. Consistent with that basic policy of treating the records as confidential, Congress in 1957 amended the criminal information statute to include the non-dissemination language presently provided by 28 U.S.C. § 534(b). *Id.* The Court then discussed the FBI's historical exception "allow[ing] the subject of a rap sheet to obtain a copy," as reflected in former 28 CFR §§ 16.30-16.34 (1988). *Id.* It characterized "the FBI's policy of granting the subject of a rap sheet access to his own criminal history" as "consistent with its policy of denying access to all other members of the general public." 489 U.S. at 771. Thus at the first step—its historical analysis—the Supreme Court pointed out the FBI's view that 28 U.S.C. § 534 did not prevent the subject of a rap sheet from obtaining a copy.

The Court went on to discuss FOIA, which identifies nine categories of documents that are exempt from its broad disclosure requirements. In the District of Columbia Circuit Court of Appeals' decision in the *Reporters Committee* case, it had held that Exemption 3,[4] which applies to documents that are specifically exempted from disclosure by another statute, did *not* apply, because 28 U.S.C. § 534 did not qualify as a statute

---

[4] Exemption 3 is codified at 5 U.S.C § 552(b)(3).

"'specifically'" exempting rap sheets from disclosure. *Reporter's Comm. For Freedom of Press v. Dep't of Justice*, 259 U.S. App. D.C. 436, 816 F.2d 730, 734 (1987) *rev'd on other grounds*, 489 U.S. 749 (1989).[5] While the petitioners abandoned reliance on Exemption 3 in the Supreme Court, the Court's opinion made the passing observation that 28 U.S.C. § 534(b) was "perhaps not specific enough to constitute a statutory exemption under FOIA Exemption 3." 489 U.S. 765 & n.17.

The U. S. Supreme Court instead analyzed Exemption 7(C) under FOIA, which excludes records or information compiled for law enforcement purposes, "but only to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[6] Thus, at the second step of its analysis—identifying the pertinent FOIA exemption—the

---

[5] The Circuit Court observed:

> The government's contention that [28 U.S.C. § 534(b)], which authorizes the Attorney General to stop exchanging information with a particular governmental entity if that entity discloses the information, brings the statute within Exemption 3 is unpersuasive. Subsection (b) does not speak to the Attorney General's authority to disclose or refuse to disclose to the public; only by implication does it even address the recipient agency's authority to disclose to the public.

816 F.2d at 735 (emphasis omitted).

[6] The Court observed that Exemption 6, codified at 5 U.S.C. § 552(b)(6), and which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," was also arguably applicable, but having found the broader Exemption 7 to apply, found "no occasion" to address the application of Exemption 6. 489 U.S. at 755 n.7, 762 n.12.

20

Supreme Court relied on an exemption that applies only when privacy is invaded.

Privacy is not invaded when an individual reviews records that are only about himself.

The Court then identified the Privacy Act of 1974, codified at 5 U.S.C. § 552a, as

supporting the conclusion that a privacy interest can inhere in the nondisclosure of

compiled computerized information. 489 U.S. at 766. It described the Privacy Act as

"provid[ing] generally that '[n]o agency shall disclose any record which is contained in a

system of records . . . *except pursuant to a written request by, or with the prior consent*

*of, the individual to whom the record pertains.'*" *Id.* (emphasis added) (some alterations

in original) (quoting 5 U.S.C. § 552a(b). At this third stage of analysis—deciding

whether disclosure of compiled computerized information can violate privacy—the

Supreme Court relied on an analogous nondisclosure statute that allows disclosure of a

record to the individual to whom the record pertains.

Finally, the holding of the decision reflected an intentional distinction between the

subject of the rap sheet and a third party. It said,

> Accordingly, we hold as a categorical matter that a *third party's* request for
> law enforcement records or information about a private citizen can
> reasonably be expected to invade that citizen's privacy.

489 U.S. at 780 (emphasis added).

We agree with the trial court that by no reasonable reading does *Reporters*

*Committee* suggest that the DOC was justified in withholding Mr. Adams's FBI

rap sheet information from him.

21

The DOC nonetheless points to a supposed federal regulatory distinction between disclosing criminal history information it obtains through a fingerprint card-based request to the FBI and information it obtains through a name and date of birth request through the III System.

What came to be called the Interstate Identification Index System, a system that links federal and state criminal records systems, became operational through the FBI's National Crime Information Center (NCIC) in 1983. *See* James Jacobs & Tamara Crepit, *The Expanding Scope, Use, and Availability of Criminal Records*, 11 N.Y.U. J. LEGIS. & PUB. POL'Y 177, 181 (2007-08), and historical materials cited therein. "The III enables the FBI to direct searchers to the states containing records on the subject of the search" and for this reason "is called a 'pointer system'—it tells law enforcement officials which states have criminal history record information on a particular subject and allows searchers to obtain this information directly from the state repository where the information is located." *Id.* at 182 (footnote omitted). The terms "Interstate Identification Index" and the shorthand "III System" were first reflected in federal regulation in 1999, when the Department of Justice adopted a final rule amending its regulations to expand access to federal criminal history record information to some private entities and some noncriminal justice governmental agencies; to acknowledge access to such information by the National Instant Criminal Background Check System (NICS) under the Brady Handgun Violence Prevention Act of 1993; and at the same time

to "modernize language to ensure that the regulations accurately reflect current FBI practices [and] names of systems and programs." Federal Bureau of Investigation, Criminal Justice Information Services Division Systems and Procedures, 64 Fed. Reg. 52,223, 52,229 (Sept. 28, 1999) (Attorney General Order No. 2258-99).

The DOC correctly observes that the federal regulations in Title 28, chapter 1, part 20 of the Code of Federal Regulations govern the access issue under federal law. 28 C.F.R. § 20.34 addresses the procedure by which "an individual may obtain a copy of his III System record" and states that the individual's "III System record . . . is available to that individual for review" so long as he has a criminal record supported by fingerprints that have been entered in the III system. 28 C.F.R. pt. 20 app., § 20.34 cmt. The DOC does not dispute that Mr. Adams has a criminal record supported by fingerprints entered in the III System.

28 C.F.R. § 20.34 also sets forth a procedure by which an inmate may request that a law enforcement agency obtain a copy of his III System record for his review:

> *Procedure.* 1. All requests for review must be made by the subject of the record through a law enforcement agency which has access to the III System. That agency within statutory or regulatory limits can require additional identification to assist in securing a positive identification.
> 2. If the cooperating law enforcement agency can make an identification with fingerprints previously taken which are on file locally and if the FBI identification number of the individual's record is available to that agency, it can make an on-line inquiry through NCIC to obtain his III System record, or, if it does not have suitable equipment to obtain an on-line response, obtain the record from Clarksburg, West Virginia, by mail. The individual will then be afforded the opportunity to see that record.

3. Should the cooperating law enforcement agency not have the individual's fingerprints on file locally, it is necessary for that agency to relate his prints to an existing record by having his identification prints compared with those already on file in the FBI, or, possibly, in the state's central identification agency.

4. The subject of the requested record shall request the appropriate arresting agency, court, or correctional agency to initiate action necessary to correct any stated inaccuracy in his record or provide the information needed to make the record complete.

28 C.F.R. pt. 20 app., § 20.34) cmt.

Another regulation under part 20 requires that any state wishing to have access to federal criminal information must submit a Criminal History Record Information Plan that includes operational procedures that "[i]nsure the individual's right to access and review of criminal history record information maintained for purposes of accuracy and completeness" by instituting procedures that allow individuals to review, "without undue burden" "any criminal history information about the individual." 28 C.F.R. § 20.21(g)(1).

The DOC fails to explain why these are not the controlling federal regulations. It directs our attention instead to 28 C.F.R. § 16.30, which provides a different but non-exclusive procedure through which an inmate can obtain criminal history information. It directs us to regulations that impose sanctions for an agency's misuse of information and for an agency's improper dissemination of information in violation of 28 U.S.C. § 534(b)—but without any companion authority suggesting that providing an inmate with III System information *is* misuse or improper dissemination.

24

DOC also points to provisions of 28 C.F.R. §§ 513.11 and 513.20. 28 C.F.R. § 513.11(b), in particular, requires requests for III System information to be directed to the FBI. But subsections 513.11 and 513.20 are part of chapter V of Title 28, dealing with the federal "Bureau of Prisons, Department of Justice." The regulations address how an "inmate" may obtain such records, with "inmate" defined for purposes of the chapter to mean "all persons in the custody of the Federal Bureau of Prisons or Bureau contract facilities." 28 C.F.R. § 500.1(c). They discuss records in an "institution's" files, with "institution" defined for purposes of the chapter to mean "a U.S. Penitentiary" or one of a list of other federal correctional facilities. 28 C.F.R. § 500.1(d). The regulations have no application to Mr. Adams or to records in his central file at Coyote Ridge.

None of the federal regulations identified by the DOC is inconsistent with longstanding federal law authorizing inmate access to his or her FBI criminal history information.

Finally, the DOC cites *Sargent v. Seattle Police Department*, 179 Wn.2d 376, 399, 314 P.3d 1093 (2013), as somehow establishing that "[a]t the time, [the DOC's] was a reasonable interpretation of both state and federal law." Br. of Appellant at 20. It apparently relies on *Sargent*'s holding that the Seattle Police Department properly withheld "nonconviction criminal history" information from the subject of the information, who failed to support the request with an assertion that the information was inaccurate or incomplete. 179 Wn.2d at 399-400. The police department's withholding

25

was supported by a provision of the Washington State Criminal Records Privacy Act, chapter 10.97 RCW, which required such an assertion.[7] Mr. Adams's request was not for nonconviction criminal history information and does not present the issue addressed in *Sargent*.

The trial court did not err in concluding that the DOC's position as to federal law was indefensible.

### Withholding of State Criminal History Information

The State offers a more abbreviated defense of its withholding of Mr. Adams's state criminal history information. The only legal authority that the DOC argues supported its mistaken but allegedly good faith withholding of Mr. Adams's state rap sheet information is WAC 446-20-090, which provides individuals with a right to review their criminal history information for a reasonable fee. The regulation was not promulgated under the PRA, but under chapter 10.97 RCW, the Washington State Criminal Records Privacy Act. It creates a right that is in addition to, not a substitute for, Mr. Adams's rights under the PRA.

---

[7] "At the time of the show cause hearing, the [act] provided that '[n]o person shall be allowed to retain or mechanically reproduce any nonconviction data except for the purpose of challenge or correction *when the person who is the subject of the record asserts the belief in writing that the information regarding such person is inaccurate or incomplete.*' Former RCW 10.97.080 (2010)." *Sargent*, 179 Wn.2d at 400 (emphasis added) (alteration in original) (footnote omitted).

Beyond that, the DOC argues only that the state patrol formerly took the position that Washington State criminal history information was exempt from the PRA under RCW 10.97.050 and RCW 10.97.080, and DOC employees feared they would violate the agency's user agreement with the patrol and lose access to information if the DOC did not abide by the patrol's interpretation. It does not challenge the trial court's conclusion that the state patrol's reading of those provisions (a reading the patrol has abandoned) was indefensible. It argues instead that "[a]s the WSP is vested with the authority to administer all operating phases of ACCESS and the Washington Crime Information Center which encompasses the records which are the subject of RCW 10.97, the Department was reasonable to rely on the WSP's position." Br. of Appellant at 22.

Under the PRA, "[t]he agency must shoulder the burden of proving that one of the [A]ct's narrow exemptions shields the records it wishes to keep confidential." *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 794, 791 P.2d 526 (1990) (court was precluded from deferring to education board's regulation guaranteeing confidentiality of records, and had to decide for itself whether the PRA exempted those records from disclosure). Even if the DOC's user agreement had prohibited it from providing inmates with access to their records (and it did not), "an agency's promise of confidentiality or privacy is not adequate to establish the nondisclosability of information; promises cannot override the requirements of the disclosure law." *Hearst v. Hoppe*, 90 Wn.2d 123, 137, 580 P.2d 246

27

(1978); WAC 44-14-06002(1) ([a]n agency agreement or promise not to disclose a record cannot make a disclosable record exempt from disclosure).

The DOC had no right to rely on the position of the state patrol or on the terms of any interagency agreement in determining whether the requested records were exempt from disclosure under the PRA.

*The* Chester *Decision*

Finally, the DOC contends that the trial court erred when it relied on the DOC's actions following the *Chester* decision as a basis for concluding that the agency acted in bad faith. It argues that *Chester* presented different facts and a request for only fingerprint-based records, not an III System record. We have already rejected the DOC's argument that the III System character of a criminal history record makes it non-disclosable to an inmate by the DOC.

The DOC only halfheartedly argues that Mr. Chester's case is distinguishable, pointing out that he was also complaining of withholding of his medical records and other information not at issue in Mr. Adams's case. It cannot and does not dispute that in Mr. Chester's case it withheld similar criminal history record information relying on the same legal authority that it relied upon in the trial court here: principally 28 U.S.C. § 534 and RCW 10.97.080. The Spokane County Superior Court's memorandum decision explained why neither statute applied, discussed *Reporters Committee*, and squarely and directly ruled that rap sheet information in the possession of the DOC is not exempt from

disclosure under the PRA. Yet the DOC did not stop to reconsider its exemption claim.

It continued in its dealings with Mr. Adams to follow the discredited view of the state

patrol rather than the reasoned ruling of the Spokane court.

The ruling in *Chester* came four months after the initial withholding of Mr.

Adams's records and nine months before the DOC relented as to about a third of them.[8]

What the trial court appears to have found most significant about the DOC's refusal to

heed the *Chester* decision is that it forecloses any argument by the DOC that it simply

didn't realize there was a problem with the legal position it had taken. The trial court

reasonably viewed the DOC's actions as illustrating its indifference to whether it was

withholding records improperly.

CROSS APPEAL

*Burden of proof*

Mr. Adams contends that the trial court erred in imposing the burden on him of

proving bad faith under the newly enacted RCW 42.56.565(1). He argues that the burden

---

[8] In passing, the DOC argues that its attempt to present 11 pages of Mr. Adams's records for his review in August 2012, only to have Mr. Adams refuse to review them, demonstrates the absence of bad faith on its part. But this was still incomplete disclosure, it occurred seven months after the state patrol had taken the position that these documents could be released, and it does not negate the fact that the claim of exemption was never seriously examined in the first place. At most, it could bear on the period for which penalties were imposed—but since the DOC continued to withhold the majority of the ACCESS printouts, it was within the trial court's discretion to disregard the belated attempt at partial disclosure for that purpose as well.

29

of proof under the PRA is "in all instances" on the offending agency, citing RCW 42.56.550. Br. of Resp't/Cross Appellant at 30. That statute provides that the burden of proof shall be on the agency "to establish that refusal to permit public inspection and copying in accordance with a statute that exempts or prohibits disclosure," RCW 42.56.550(1), and to establish that "the estimate [of time to respond] provided is reasonable," RCW 42.56.550(2). It does not address the burden of proving any other matters.

Mr. Adams has no basis for claiming error, since the issue of bad faith was resolved in his favor. We note, however, that generally it is a plaintiff's burden to prove the elements necessary to recovery. *Baldwin v. Sisters of Providence*, 112 Wn.2d 127, 135, 769 P.2d 298 (1989). Accordingly, in *Faulkner*, we held that an inmate must establish bad faith. *Faulkner*, 183 Wn. App. at 103. The trial court did not err.

*Consideration of* Yousoufian *2010 factors*

Mr. Adams next assigns error to the trial court's failure in the penalty hearing to consider on the record the *Yousoufian* 2010 factor of the size of the DOC and the inadequacy of the DOC's records denial sheet. He argues that both should have been considered in fixing the amount of the penalty.

Under RCW 42.56.565(1), the court must make a threshold determination that the agency acted in bad faith in denying a record requester the opportunity to inspect or copy a public record. If that threshold showing is made, the statute contemplates that the trial

court will then exercise its discretion under RCW 42.56.550(4) "to award . . . an amount not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy [the requested] record."

In *Yousoufian* 2010, our Supreme Court outlined a multifactor analysis to "provide[] guidance to trial courts, more predictability to parties, and a framework for meaningful appellate review," identifying seven mitigating factors and nine aggravating factors to be considered by a court in imposing a penalty under the PRA. 168 Wn.2d at 468. The ninth aggravating factor was "a penalty amount necessary to deter future misconduct by the agency *considering the size of the agency* and the facts of the case." *Id.* (emphasis added). In announcing the multifactor analysis for arriving at an appropriate penalty, the *Yousoufian* 2010 court "emphasize[d]" that

> [t]he factors may overlap, are offered only as guidance, may not apply equally or at all in every case, and are not an exclusive list of appropriate considerations. Additionally, no one factor should control. These factors should not infringe upon the considerable discretion of trial courts to determine PRA penalties.

*Yousoufian* 2010, 168 Wn.2d at 468. A trial court nonetheless abuses its discretion if it fails entirely to conduct its penalty analysis within the *Yousoufian* 2010 framework. *Sargent*, 179 Wn.2d at 398.

We review a trial court's determination of a proper PRA penalty for abuse of discretion. *Yousoufian v. Office of Ron Sims*, 152 Wn.2d 421, 430-31, 98 P.3d 463 (2004) (*Yousoufian* 2004). Under this standard, a trial court's decision will only be

31

reversed if its decision "is manifestly unreasonable or based on untenable grounds or reasons." *Yousoufian* 2010, 168 Wn.2d at 458. "A court acts on untenable grounds if the record does not support its factual findings, and it acts for untenable reasons if it uses 'an incorrect standard, or the facts do not meet the requirements of the correct standard.'" *Francis*, 178 Wn. App. at 65 (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)). A trial court's decision is manifestly unreasonable if the court, "despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take." *Yousoufian* 2010, 168 Wn.2d at 458-59 (internal quotation marks omitted).

Here, the trial court conducted its penalty analysis within the *Yousoufian* 2010 framework and made the following finding as to the ninth aggravating factor:

> [D]eterrence of future misconduct; the Court finds that a substantial penalty is necessary, and, in respect to the separation of powers issue, the executive branch of government is required to follow the decisions that are properly within the authority of the judicial branch of government. The Court further finds that the existence of other legal remedies are available to the DOC and that the DOC cannot simply ignor[e] judicial decisions as occurred herein, therefore this factor is present.

CP at 12. It imposed a per-day penalty of $35 based on its finding of two mitigating factors and three aggravating factors. *Id.* at 13.

Mr. Adams has not demonstrated that the trial court failed to consider the DOC's size. The court explicitly addressed the need to impose a penalty amount necessary to deter future misconduct by the agency. In making a judgment about the amount

32

necessary to deter future misconduct, the trial court would necessarily have considered the size of the agency—likely under *Yousoufian* 2010, which it was following, but in any event as a matter of common sense. It was not required to place its thought process on the record. While Mr. Adams believes that a $24,535 penalty is insufficient to deter the DOC given the size of its operating budget, he has not shown that the trial court abused its discretion in arriving at that amount.

Mr. Adams also contends that the trial court erred in failing to consider the inadequacy of the DOC's records denial sheet, which he claims fell short of the requirements of RCW 42.56.201(3). Under that statute,

> Agency responses refusing, in whole or in part, inspection of any public record shall include a statement of the specific exemption authorizing the withholding of the record (or part) and a brief explanation of how the exemption applies to the record withheld.

RCW 42.56.210(3). As Mr. Adams points out, in reviewing the *Yousoufian* 2010 factors, the trial court did not explicitly find any failure by the DOC to comply with the PRA's procedural requirements.

The trial court unquestionably considered the deficiency of the DOC's identification of a basis for exemption, however—that deficiency was a principal basis for its finding that the DOC acted in bad faith. But it is apparent that the trial court differentiated between compliance with procedural requirements *in form*, and compliance with procedural requirements *in substance*. As a matter of form, the Coyote Ridge

records department provided Mr. Adams with a contemporaneous log on which it disclosed that it was withholding some documents, provided some description of what they were, and provided citations to statutes and regulations as the asserted basis for its withholding.

The court chose to address the substantive inadequacy of the DOC's explanation elsewhere in its written and oral rulings. It found that aggravating factors four and five—the "unreasonableness of any explanation for noncompliance by the agency" and "negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA by the agency"—both justified an increased penalty. 168 Wn.2d at 468. The court did not overlook the DOC's failure to identify an exemption that actually justified its withholding.

Because the trial court adequately considered each of the *Yousoufian* 2010 factors, it did not abuse its discretion in its assessment of penalties.

### Cost request

Mr. Adams devotes a section of his brief to his entitlement to costs on appeal under RCW 42.56.550(4), RAP 18.1(b), and RAP 14.3(b). RCW 42.56.550(4) provides that all costs shall be awarded to "[a]ny person who prevails" in an action under the PRA. Because Mr. Adams has prevailed he is entitled to all costs reasonably incurred in litigating the appeal subject to compliance with RAP 18.1(d).

No. 32012-0-III
*Adams v. Wash. State Dep't of Corrections*

Affirmed.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Fearing, .J.

35