# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DEREK E. GRONQUIST, | No. 58808-1-II |
| Appellant/Cross Respondent, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF CORRECTIONS, | PUBLISHED OPINION |
| Respondent/Cross Appellant. | |

CRUSER, C.J. — In October 2020, Derek Gronquist, at the time an inmate in the Department of Corrections (DOC), mailed a records request to DOC requesting invoices from a specific set of DOC contracted attorneys during a specified time period. DOC provided an estimated date of production of December 30, 2020, but extended this estimate twice, citing COVID-19 related delays. When DOC ultimately sent Gronquist records in March 2021, it included a large number of unresponsive records and failed to include all of the records that he had requested. Gronquist did not inform DOC that he was missing documents, but instead filed suit in March 2022 for violation of the Public Records Act (PRA).[1] DOC continued to produce responsive documents to Gronquist throughout litigation, with the final production occurring in February 2023.

---

[1] Ch. 42.56 RCW.

Because Gronquist was incarcerated at the time of the records request, to recover penalties under the PRA, he is required to show not only that DOC violated the PRA, but also that it acted in bad faith in doing so. RCW 42.56.565(1). In an oral ruling in January 2023, the trial court found that DOC violated the PRA and acted in bad faith, and awarded Gronquist penalties amounting to over $450,000. Two weeks later, the court sua sponte reconsidered its decision, reversing its finding of bad faith after encountering a case from Division Three of this court, which it had not considered during its initial review of Gronquist's case. Both parties now appeal. DOC argues that the trial court erred in finding that it violated the PRA and Gronquist argues that the trial court erred in finding that DOC did not act in bad faith.

We hold that DOC violated the PRA but did not do so in bad faith. DOC's response was not timely, nor was its search adequate, so the trial court correctly found that it violated the PRA. However, a finding of bad faith requires an inmate requestor to show that the agency's actions amount to more than negligence, which Gronquist has failed to do. Accordingly, we affirm the trial court's ruling.

Because we agree with the trial court that DOC violated the PRA, and DOC failed to argue that Gronquist should not be entitled to the attorney fees he was awarded below *even if* it violated the PRA because Gronquist did not show that DOC acted in bad faith, we decline to reverse the attorney fees awarded below. However, because Gronquist failed to devote a separate section of his opening brief to this request, as required by RAP 18.1(b), we deny Gronquist's request for attorney fees on appeal.

## FACTS

### I. GRONQUIST'S PRA REQUEST

On October 3, 2020, Derek Gronquist mailed a PRA request to DOC, requesting "[a]ll invoices for payment of services submitted by contractors for the provision of legal services to prisoners under RCW 72.09.190 between July 1 and December 31, 2019." Clerk's Papers (CP) at 46. The request went on to clarify that it sought "to determine the total amount of taxpayer funds paid to contractors of legal services for inmates (commonly referred to as 'contract attorneys') during the specified time period, and the specific services those contractors were seeking compensation for." *Id.* At the time of the request, Gronquist was incarcerated in a DOC facility in Walla Walla, and operated the Correctional Oversight Group, "a nonprofit corporation working to remedy waste, abuse, and harmful practices of the Department of Corrections." *Id.* at 2. Gronquist requested these records to investigate what he thought to be improper billing practices within DOC.

DOC received Gronquist's letter on October 8, 2020, and assigned Public Records Specialist Donna Williams to manage the request. Upon receipt, a staff member entered the request in DOC's records management software. When prompted to enter a brief description of the request, the staff member wrote "All invoices for payment of services submitted by contract attorneys for the provision of legal services to prisoners under RCW 72.09.190 between July 1, 2019 and December 31, 2019," but omitted the language pertaining to Gronquist's purpose for requesting the records. *Id.* at 219. On October 12, Williams mailed a letter to Gronquist acknowledging the request and confirming this language. In this letter, Williams provided an estimated response date of December 30, 2020.

A. Initial Delays and Search

At the times relevant to this case, DOC contract attorneys provided two forms to DOC to receive payment: a "Form A-19," or "an invoice voucher," which lists the total amount of hours worked, and a monthly report, which provides further details of the work performed. *Id.* at 151. DOC interpreted Gronquist's request for "invoices" to be requesting only the A-19 forms. *Id.* at 219. The first documented activity on Gronquist's request occurred on December 21, 2020, when Williams assigned the request to the internal department that stored the requested records, nine days before the estimated deadline. There is no record of any activity occurring between December 21 and December 30, when Williams sent another letter to Gronquist, stating that "[w]hile DOC remains open and operational, due to COVID-19 staffing and remote work, additional time is needed to complete your request. Therefore, we anticipate being able to provide you an installment within 29 business days; on or before February 11, 2020 [sic]."[2] *Id.* at 229. There is no record of any further activity on this request until February 11, 2021, when Williams sent Gronquist another letter, repeating the same language about COVID-19 staffing issues and further extending the estimated deadline to March 26, 2021.

On the same day that Williams sent the second extension letter, DOC performed the first documented search on this request. DOC assigned the task to a fiscal analyst, Steve Land, who recorded four hours searching his email, the file server, and DOC's financial reporting system for "the attorneys he knew to provide legal services for incarcerated individuals." *Id.* at 678. Due to COVID-19 restrictions, Land was unable to search for the physical files in person, so he provided

---

[2] The letter extending the estimated time erroneously said "2020," but it was meant to say "2021." Neither party asserts that the extended deadline was actually in 2020.

a list of records to pull from physical storage to two other department employees. These employees had to wait an unspecified amount of time for permission for onsite access, but ultimately provided the records they located to the public records administrative assistant, who uploaded the records into a shared drive for Williams' review on March 23, 2021. Williams reviewed the records on March 24, 2021, and sent Gronquist a letter the same day to inform him that DOC would send him 242 pages of documents upon receipt of $47.05 for copies and postage. Gronquist sent payment on April 6, 2021, and requested that the records be sent to him at the penitentiary.

B. First Production of Records

Williams sent the first batch of records on April 20, 2021. The cover letter of this production stated, "If you wish to appeal my decision for redacting or withholding records in part or whole, you may do so by submitting the appeal portion of the form to the Public Disclosure Appeals Office," and noted that the request had been closed. *Id.* at 238. This initial production included 46 out of the 72 A-19 forms and 13 of the 72 monthly reports that were responsive to Gronquist's request. The production also included 150 pages of documents that were not responsive to Gronquist's request. Though DOC understood the request to be for A-19 forms, it included some monthly reports and other records in an effort to be more inclusive. Gronquist did not submit the included appeal form, nor did he contact DOC to inform them that he believed that the production was missing records or that some of the provided records were not responsive.

C. Subsequent Productions

DOC first learned that Gronquist considered its production incomplete when he filed suit in March 2022. During the litigation, DOC conducted additional searches for the records that Gronquist believed were missing, providing 21 additional A-19 forms and 51 monthly reports on

June 30, 2022, and 3 more A-19 forms and monthly reports on September 6. In November 2022, Gronquist's counsel identified two A-19 forms and five monthly reports that had not yet been produced. These final documents were produced on February 16, 2023, shortly after the trial court had issued an oral ruling imposing a penalty of $100 per day for these missing documents.

## II. PROCEDURAL HISTORY

The trial court heard arguments from the parties on December 16, 2022. On January 20, 2023, the trial court issued an oral ruling finding that DOC violated the PRA and that it acted in bad faith. The trial court found that DOC made no efforts to locate documents responsive to Gronquist's request between October 12 and December 30, 2020, and that there was "very little activity" on Gronquist's request between December 30, 2020, and February 11, 2021. Verbatim Rep. of Proc. (VRP) (Jan. 20, 2023) at 5. The trial court concluded that the monthly reports were "clearly responsive" to the record request, but that while the initial estimate of December 30, 2020, was reasonable given the COVID-19 circumstances, the additional delays between December 2020 and March 2021 were not reasonable. *Id.* at 8. Thus, the trial court concluded that DOC violated the PRA, as its response was neither timely nor complete, and it was overinclusive. The trial court further concluded that DOC's conduct rose to the level of gross negligence, which supported a finding of bad faith. Because it found that DOC acted in bad faith, the trial court awarded Gronquist daily penalties ranging from $10-$100 per day for each document, depending on the amount of time it was withheld. These penalties added up to $456,910.

Before this ruling could be memorialized in a written order, however, the trial court encountered two PRA cases[3] that it had not considered in its original decision, which caused the court to sua sponte reconsider its decision. The court invited additional briefing on these cases, and found in an oral ruling on February 10 that DOC *did* violate the PRA, but did *not* act in bad faith, as gross negligence does not support a finding of bad faith under *Faulkner*. During this oral ruling, the court clarified that it maintained all of the factual findings of its original ruling on January 20, but reversed the legal conclusion on the issue of bad faith. The court signed a written order reflecting this decision in March 2023.

Gronquist moved for reconsideration, alleging that after the court's oral ruling reversing itself and finding that DOC had not acted in bad faith and the entry of the final order denying penalties to Gronquist, DOC made a further production of records. Gronquist argued that this most recent production of records bore upon the question of bad faith. Along with his motion to reconsider, Gronquist requested an additional six weeks to conduct discovery into the production of these records. The court denied this request, concluding that the issue of the late produced documents goes to the PRA violation, and not to the issue of bad faith, and that there was no new information that would cause the court to reconsider its decision.

ANALYSIS

Gronquist appeals the trial court's decision, contending that (1) the trial court erred in reversing its original decision holding that gross negligence was sufficient to establish bad faith; (2) regardless of the exact standard, he has shown that DOC acted in bad faith, and; (3) the trial

---

[3] At the time, the trial court was evaluating a separate PRA case, in which the parties cited to the cases of *Faulkner v. Dep't of Corr.*, 183 Wn. App. 93, 332 P.3d 1136 (2014) and *Hoffman v. Kittitas County*, 194 Wn.2d 217, 449 P.3d 277 (2019).

court erred in denying his request for additional discovery and rejecting his motion for reconsideration. DOC cross appeals, arguing that (1) the trial court erred in failing to address the adequacy of its search because, according to DOC, a finding that the search was adequate would preclude the finding of a PRA violation; (2) the trial court correctly applied the wanton or willful standard for bad faith, and; (3) Gronquist should not be entitled to the attorney fees that he was awarded below.

We (1) affirm the trial court's finding that DOC violated the PRA; (2) affirm the trial court's finding that DOC did not act in bad faith, and; (3) reject Gronquist's argument that the trial court failed to conduct its review of his motion for reconsideration de novo. Because Gronquist has shown that DOC violated the PRA, and because DOC failed to argue that Gronquist should not be entitled to the attorney fees he was awarded below *even if it* violated the PRA because Gronquist did not show that DOC acted in bad faith, we leave the attorney fees awarded below undisturbed. However, because Gronquist failed to devote a separate section of his opening brief to this request, as required by RAP 18.1(b), we deny Gronquist's request for attorney fees on appeal.

## I. PRA VIOLATION [4]

DOC argues that the trial court erred in failing to address the adequacy of its search, and that a finding that DOC's search was adequate would preclude a finding that it violated the PRA. However, an agency can violate the PRA by an inadequate search *or* by failing to timely respond to a request, so the trial court did not err in finding a PRA violation based only on an untimely

---

[4] Because a reversal on the issue of whether DOC violated the PRA would make a finding of bad faith irrelevant, we address DOC's cross appeal first.

response. And even if it was error for the trial court to not consider DOC's adequate search argument, DOC did not prove that its search was adequate, so this argument fails regardless.

A. Standard of Review

We review agency actions under the PRA de novo. RCW 42.56.550(3); *Neighborhood All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). When the record consists only of affidavits, memoranda of law, and other documentary evidence, the appellate court stands in the same position as the trial court. *Progressive Animal Welfare Soc. v. Univ. of Washington*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994) (*PAWS*) (plurality opinion).

B. Legal Principles

"The PRA is a strongly worded mandate for broad disclosure of public records." *Neighborhood All.*, 172 Wn.2d at 714. Agencies must disclose any public record upon request, unless the requested record falls within a specific, enumerated exception. RCW 42.56.070(1). To facilitate the goals of the PRA, its disclosure provisions are construed broadly, and its exceptions are construed narrowly. RCW 42.56.030. "The PRA provides a cause of action for two types of violations: (1) when an agency wrongfully denies an opportunity to inspect or copy a public record or (2) when an agency has not made a reasonable estimate of the time required to respond to the request." *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 651, 334 P.3d 94 (2014); RCW 42.56.550(1)-(2). An agency bears the burden of demonstrating that it provided for the "fullest assistance to inquirers and the most timely possible action on requests for information." RCW 42.56.100.

*1. Timeliness*

The PRA mandates that an agency respond to a public records request within five days of receipt, either by (1) providing the records; (2) acknowledging the request and providing a reasonable estimate of the time required to respond, or; (3) denying the request. RCW 42.56.520(1). The PRA does not require an agency to strictly comply with its estimated time of production, so long as the agency was working diligently to promptly provide the records requested. *Hobbs v. State*, 183 Wn. App. 925, 940, 335 P.3d 1004 (2014). "Extended estimates are appropriate when the circumstances have changed." *Andrews*, 183 Wn. App. at 652. The agency bears the burden of proof to show that the estimate it provided was reasonable. RCW 42.56.550(2).

*2. Adequacy*

An agency violates the PRA when it fails to conduct an adequate search that is reasonably calculated to uncover all relevant records. *Neighborhood All.*, 172 Wn.2d at 724. "An adequate search is a prerequisite to an adequate response, so an inadequate search is a violation of the PRA because it precludes an adequate response." *Id.* Whether a search was adequate is judged by a standard of reasonableness and depends on the facts of each case. *Id.* at 720. An agency is required to perform more than a perfunctory search, and must follow obvious leads as they are uncovered. *Id.* An agency is not required to search *every* place a record could conceivably be stored, only the places the requested records are *reasonably likely* to be found. *Id.* The fact that additional responsive records are later found does not itself establish that a search was inadequate. *Id.* Instead, the focus of the inquiry should be on whether the search was reasonably calculated to uncover all relevant records, not on whether additional responsive records exist and were not found. *Id.* We review the search as a whole for adequacy, not whether the requestor can conceive of additional

places they believe would have been more likely to produce the requested records. *Hobbs*, 183 Wn. App. at 943.

The agency bears the burden of establishing that its search was adequate. *Neighborhood All*. 172 Wn.2d. at 721. To do so, the agency may rely on "reasonably detailed, nonconclusory affidavits submitted in good faith." *Id*. To establish that a search was adequate, such affidavits should include the search terms and the type of search performed, as well as information to establish that all places likely to contain responsive materials were searched. *Id*.

C. Application

*1. Timeliness*

DOC argues that the multiple extensions and delays can be attributed to COVID-19 and the difficulties experienced in searching for physical records during the pandemic, as well as the heavy workload of DOC's public records specialists. Relying on *Andrews*, DOC contends that " '[e]xtended estimates are appropriate when the circumstances have changed.' " Br. of Resp't at 32 (quoting *Andrews*, 183 Wn. App. at 652). However, DOC fails to describe any way in which the circumstances had changed between the receipt of the request in October 2020 and the first extension in December 2020, or even through the second extension in February 2021. Multiple extensions would have been appropriate if DOC had begun searching and realized that the request would take more time to complete than initially estimated, due to the complexity of the search or pandemic related difficulties. Such was not the case here— DOC's first extension was taken before it had even begun looking for documents, when the only action taken on the request was simply delegating it to the internal unit most likely to have the requested records.

While the PRA does not strictly require an agency to produce records within its estimated timeframe, extensions are only appropriate when the agency is working diligently to fulfill the request but needs more time. *Hobbs*, 183 Wn. App. at 940. The first action taken with regard to this request occurred only nine days before the anticipated deadline, two months after the request was received. DOC argues that a lack of documentation does not necessarily mean that there was no activity,[5] and that there is no authority that requires it to document its searches. Even if this is true, an agency bears the burden of proving that its response was reasonably timely, so any lack of documentation only disfavors DOC. DOC has failed to show that it was working diligently to fulfill the request; the first documented search did not occur until February, after DOC had already extended its initial estimate twice. The trial court found that the search was not timely based solely off the initial delay, which DOC argues can be excused due to the pandemic. However, COVID-19 circumstances do not explain why it took two months to assign the request to the appropriate internal unit, nor why two extensions were required before there was even an attempt to search for records in person. Thus, we find that DOC's response to Gronquist's records request was not timely, and that the trial court did not err in finding that DOC violated the PRA on these grounds.

*2. Adequacy*

DOC argues that the trial court erred in failing to address the adequacy of its search, and that a finding that DOC's search was adequate would preclude finding that it violated the PRA. This argument is incorrect. An inadequate search is tantamount to a denial of records, which is a

---

[5] Notably, the trial court found that the first search occurred on February 11, 2021. DOC did not specifically assign error to this finding of fact, but loosely argued that "Gronquist's assertion that a lack of documentation equates to a lack of work or diligence is without any basis in the record." Br. of Resp't at 35-36. Regardless of whether we accept this factual finding as a verity, however, DOC bears the burden of proving timeliness, which they cannot do without such documentation.

separate violation than one based on a failure to respond within a reasonable timeframe. *Andrews*, 183 Wn. App. at 651. Thus, even if the trial court had found that DOC's search was adequate, it still could have found a violation of the PRA based on timeliness alone. Moreover, DOC has not met its burden of showing that its search was adequate, as discussed below.

Gronquist argues that DOC's search was inadequate because it omitted the purpose of his request, thus narrowing the understanding of responsive documents to include only A-19 forms and not monthly reports. Nevertheless, this interpretation of Gronquist's request was reasonable, considering the format of his request. In his request letter, Gronquist stated that he was requesting "1. All invoices for payment of services submitted by contractors for the provision of legal services to prisoners under RCW 72.09.190 between July 1 and December 31, 2019." CP at 46. This portion of the text is offset from the rest, and the language specifying the purpose of the request appears in a separate paragraph, so it is reasonable that a staff member would not have included that language in the brief description of the request when entering it in the system. Furthermore, the letter of acknowledgment that DOC sent Gronquist included the exact same language, omitting the purpose of the request, meaning that Gronquist was made aware of the omission and could have reached out to DOC to clarify his request. The problem is not that DOC knowingly or even negligently withheld documents it knew to be responsive, but rather that the parties understood the word "invoice" to mean different things. Gronquist argues that the fact that DOC produced *some* monthly reports, but not all, indicates that DOC understood these reports to be responsive to the request. However, DOC staff who searched for the records included these monthly reports in an effort to be more inclusive, despite their understanding of the request being for A-19 forms only.

13

DOC should not be punished for being more inclusive in an effort to ensure that it has fully fulfilled a PRA request.

DOC correctly argues that a search does not need to be perfect to be adequate, but instead only needs to be reasonably calculated to uncover all responsive documents. *Neighborhood All.*, 172 Wn.2d at 720. Likewise, the failure to produce a responsive document is not itself a violation of the PRA, if the agency performed a reasonably adequate search. *Id.*[6] Accordingly, DOC argues that its failure to produce a number of responsive records does not necessarily mean that its search was inadequate. While this is true, an agency must still establish that the search, when viewed as a whole, was reasonably calculated to uncover all requested records, which DOC has not done.

DOC argues that the search was reasonable because it assigned the request to the appropriate internal unit and because the fiscal analyst tasked with the request, Steve Land, searched in multiple places "for the attorneys he knew to provide legal services for incarcerated individuals." CP at 678. However, DOC does not demonstrate how this analyst determined which attorneys to include, or whether he consulted any other people or resources to determine which contractors to include in the search. DOC likewise did not provide search terms used, nor did it provide any non-conclusory information to establish that it searched all places reasonably likely to contain responsive records. The record only demonstrates that Land searched the file server, his email, and the financial reporting system for "attorneys he knew to provide legal services for

---

[6] Nor is a failure to produce a responsive document automatically considered " 'silent withholding,' " as Gronquist contends. Br. of Appellant at 54 (quoting CP at 92). Silent withholding occurs when an agency fails to produce a document that it knows exists and would be responsive to a request. See *PAWS*, 125 Wn.2d at 270; *Rental Hous. Ass'n of Puget Sound v. City of Des Moines*, 165 Wn.2d 525, 537, 199 P.3d 393 (2009). While DOC's search may have been inadequate, its failure to produce documents due to an inadequate search is not silent withholding.

incarcerated individuals" and provided the list of records he came up with to staff members who were able to search for the physical files in person. *Id.* Adequacy is based off of a standard of reasonableness, and DOC has not provided enough information about the specifics of the search to adequately judge its reasonableness. Thus, we hold that DOC has not met its burden of showing that its search was adequate.

Finally, DOC argues that if Gronquist was dissatisfied with the initial production, he should have communicated his dissatisfaction with DOC directly to request the missing documents, rather than sue for a PRA violation. DOC argues that because it believed that its search was adequate and that it did produce all responsive documents, Gronquist's failure to clarify after the request was closed precludes a finding that DOC violated the PRA. This argument goes more toward the issue of bad faith than the violation itself, and just because an agency believed its search to be adequate does not mean that it was. The PRA is violated when "it reasonably appears that an agency will not or will no longer provide responsive records." *Hobbs*, 183 Wn. App. at 936. DOC violated the PRA when it closed the request, as Gronquist could reasonably assume it would no longer be providing responsive records. Therefore, Gronquist was not required to communicate with DOC to establish a violation. Nevertheless, this argument may be relevant in assessing bad faith.

## II. BAD FAITH

A finding that an agency acted in bad faith under the PRA does not require the commission of some intentional, wrongful act, but it does require the requestor to show more than negligence, which is all that Gronquist has done. Therefore, regardless of the precise wording of the standard for bad faith in the context of inmate PRA penalties, Gronquist has failed to carry his burden of

proof on this issue. Accordingly, we affirm the trial court's holding that DOC did not act in bad faith in responding to Gronquist's PRA request.

A. Standard of Review

"Whether an agency acted in bad faith under the PRA presents a mixed question of law and fact, in that it requires the application of legal precepts (the definition of 'bad faith') to factual circumstances (the details of the PRA violation)." *Francis v. Dep't of Corr.*, 178 Wn. App. 42, 51-52, 313 P.3d 457 (2013). "When underlying facts are uncontested, we apply de novo review to ascertain whether the facts amount to bad faith." *Faulkner v. Dep't of Corr.*, 183 Wn. App. 93, 102, 332 P.3d 1136 (2014). An inmate requestor bears the burden of proving that the agency acted in bad faith. *Adams v. Dep't of Corr.*, 189 Wn. App. 925, 952, 361 P.3d 749 (2015).

B. Legal Principles

To recover penalties under the PRA, an inmate requestor must show both that the agency violated the PRA, *and* that it acted in bad faith. RCW 42.56.565(1). Not only has the supreme court not interpreted the bad faith provision of RCW 42.56.565(1), but it specifically declined to do so in *Hoffman v. Kittitas County*, 194 Wn.2d 217, 226-227, 449 P.3d 277 (2019). *Hoffman* addressed bad faith in the context of the standard of appellate review for PRA penalties (an inquiry which incorporates bad faith as an aggravating factor). It specifically did *not* address the requirement that an inmate requestor prove that an agency acted in bad faith as set forth in RCW 42.56.565(1), stating that "[w]e have not yet had occasion to review the Court of Appeals' inmate PRA holdings, and this non[-]inmate case is not the appropriate vehicle for doing so." *Id.* We can therefore assume that the standard for bad faith in the context of inmate PRA requests is *at least* as severe as in the penalty context in non-inmate PRA cases, in light of the legislature's decision

to limit an inmate's ability to recover penalties under the PRA to situations in which the inmate demonstrates bad faith on the part of the agency—a showing non-inmate requestors are not required to make.

In *Yousoufian v. Office of Ron Sims*, 168 Wn.2d 444, 463, 229 P.3d 735 (2010), the supreme court opined that the traditional culpability definitions found in the Washington Pattern Instructions "do not lend themselves to the complexity of PRA penalty analysis." Thus, instead of upholding the court of appeals' approach to defining agency culpability via traditional definitions of negligence, recklessness, and wanton behavior, the supreme court set out the following range of culpability to be evaluated by the trial courts in conjunction with other aggravating factors: "negligent, reckless, wanton, bad faith, or intentional noncompliance." *Id.* at 468. This range is meant to allow courts flexibility in evaluating an agency's culpability in responding to a PRA request, rather than relying on a "strict and singular emphasis on good faith or bad faith." *Id*. at 461. From the plain language of this range, it is clear that the supreme court considers bad faith to be the highest level of culpability other than intentional noncompliance, higher than negligent or even wanton conduct.

In interpreting the bad faith requirement of the inmate PRA provision, this court has held that bad faith does not require the commission of some intentional wrongful act, but rather that "[i]n addition to other species of bad faith, an agency will be liable, . . . if it fails to carry out a record search consistently with its proper policies and within the broad canopy of reasonableness." *Francis*, 178 Wn. App. at 63. In *Francis*, this court used principles of statutory construction to evaluate the standard for bad faith in this context, concluding that "the legislature plainly intended to afford prisoners an effective records search, while insulating agencies from penalties as long as

they did not act in bad faith." *Id.* at 60. The *Francis* court held that "the failure to conduct a reasonable search or the failure to follow policies in a search" do not, alone, constitute bad faith. *Id.* at 63 n.5. The court clarified that this standard "does not make an agency liable for penalties to incarcerated persons simply for making a mistake in a records search;" rather, an inadequate and unreasonable search can *support* a finding of bad faith. *Id.* at 63. The court noted a number of circumstances that it found to be logically relevant in determining reasonableness, including:

> 1) a delayed response by [DOC], even after Francis filed suit; (2) lack of compliance with PRA procedural requirements; (3) lack of proper training and supervision; (4) "negligence or gross negligence"; and (5) sufficient clarity in Francis's request.

*Id.* at 63-64 (quoting the record).

Division Three has since reframed this standard, holding that "[i]n the PRA context, bad faith incorporates a higher level of culpability than simple or casual negligence. . . . to establish bad faith, an inmate must demonstrate a wanton or willful act or omission by the agency." *Faulkner*, 183 Wn. App. at 103. *Faulkner* ultimately embraced the holding of *Francis*, holding that "[p]enalties are owed when an agency acts unreasonably with utter indifference to the purpose of the PRA," and that the agency conduct in *Francis* was an example of a wanton act made in bad faith. *Id.* at 105. Finally, *Faulkner* holds that the bad faith requirement for the PRA "allows penalties for inmates only when the conduct of the agency defeats the purpose of the PRA and deserves harsh punishment." *Id.* at 106.

C. Application

Gronquist argues, based on *Francis*, that gross negligence is sufficient to establish bad faith, or in the alternative, that DOC's conduct rises to the level of willful or wanton as described

in *Faulkner*.[7] DOC argues that the correct standard for bad faith is wanton or willful misconduct, which the trial court correctly applied in finding that DOC did not act in bad faith. Regardless of whether we apply the standard from *Francis* or from *Faulkner*, Gronquist fails to satisfy either standard. By not informing DOC that the production was incomplete, Gronquist made it difficult to prove that the failure to produce certain documents was the result of anything but miscommunication and human error.

Moreover, we disagree with the definitions of bad faith put forth in both *Francis* and *Faulkner*. In our view, bad faith must constitute more than gross negligence or recklessness. In the context of inmate PRA requests, a finding of bad faith requires evidence that the agency either intentionally conducted an inadequate search in a manner calculated to not discover the record or intentionally withheld a record for an improper purpose, with the knowledge that doing so violated the PRA. For example, in *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695, 707, 726, 354 P.3d 249 (2015), Division One found that the City of Marysville acted in bad faith based on the city's proven strategy of communicating by phone or through personal emails to avoid information being " 'caught up in [Cedar Grove's] public records request' " and excluding certain parties from communications to give them " 'plausible deniability.' "

While *Cedar Grove* involved a non-inmate requestor, we think it instructive because by including the requirement that an inmate requestor show bad faith as a pre-condition to the award

---

[7] Gronquist also argues that the trial court erred in using the phrase " 'wanton *and* willful,' " rather than the correct "wanton *or* willful" from *Faulkner* in its oral ruling, thus holding him to a higher standard than is required by the law. Br. of Appellant at 37. However, since Gronquist does not show even the lower standard of wanton *or* willful, we need not reach this argument.

of a monetary penalty for a PRA violation, the legislature plainly sought to make it more burdensome for inmate requestors to obtain penalty awards than non-inmate requestors.

The type of conduct described in *Cedar Grove*, openly flouting the purpose of the PRA to cover up misbehavior, is far more culpable than simply performing an inadequate search, even if the search was done recklessly and without regard for the consequences. While Gronquist is able to show that the initial search was inadequate, he has not shown that the inadequacy of the search was the product of bad faith, beyond speculation that DOC purposefully withheld documents out of a desire to cover up improper practices within DOC. Gronquist's assertions, while concerning, do little to establish that the failure to produce all requested records was the result of bad faith, rather than simple negligence and miscommunication. This is particularly so given the COVID-19 restrictions DOC was operating under while searching for physical records during this time.

Gronquist argues that the inclusion of nonresponsive documents is evidence of bad faith, as was the case in *Francis*. However, DOC showed documented confusion as to what Gronquist was requesting,[8] and should not be punished for erring on the side of over-inclusivity to ensure that Gronquist received what he needed.[9] Furthermore, Gronquist did not appeal the production of nonresponsive documents, nor did he clarify his request and seek a resolution before proceeding to litigation. DOC stated that it would have reimbursed Gronquist for any fees he paid for nonresponsive documents, and that it was willing to produce the missing documents but did not

---

[8] CP at 2308-09.

[9] Gronquist contends that if DOC was confused about the scope of the request, it had a legal obligation to contact him to clarify. However, an agency is required to interpret requests broadly, and is only required to clarify if any ambiguity remains *after* applying a broad interpretation. *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 99, 514 P.3d 661 (2022). Relevant statutes and precedent do not suggest that an agency is required to contact a requestor in a case such as this.

know that the production was not complete until Gronquist filed suit. Given that the purpose of the PRA is to provide for broad disclosure of public records, it is better for an agency to be over-inclusive than to withhold records that it is unsure about. We decline to punish DOC for its over-production of nonresponsive records in this case.

Gronquist also claims that the failure to locate or provide a number of responsive documents in the initial production is evidence of bad faith, arguing that DOC had an obligation to request the records from the contractors themselves. We disagree. The cases on which Gronquist relies hold that records produced by private entities in their work with public agencies qualify as "public records" under the PRA, and an agency cannot circumvent the PRA by allowing a private entity to maintain exclusive custody of records. *See Cedar Grove*, 188 Wn. App. at 720-722; *Serv. Emps. Int'l Union Loc. 925 v. Univ. of Wash.*, 193 Wn.2d 860, 871-72 n.5, 447 P.3d 534 (2019). These cases do not hold that a search is unreasonable if the agency fails to reach out to private contractors to provide records, especially when an agency reasonably believes that it has all of the requested records in its own possession. As discussed above, an agency is not required to perform a perfect search or search every location where a record could conceivably be stored–the PRA only requires a reasonably adequate search of the locations where the records are reasonably likely to be found. *Neighborhood All.*, 172 Wn.2d at 720. DOC had no reason to believe that it did not have all of the requested records in its possession, so its search was not unreasonable simply because it did not request the records from the contractors directly. Furthermore, simply establishing that the search was unreasonable is not sufficient, on its own, to show bad faith.

In addition, DOC did not know that the production was incomplete until Gronquist filed his complaint, as he never reached out or communicated in an attempt to resolve the issue. Thus,

the failure to produce all of the relevant documents and the failure to request documents from contractors is not evidence of bad faith, but rather a result of a lack of communication between the parties. Gronquist also argues that DOC purposefully narrowed the scope of his request to only include the A-19 forms, so its failure to produce all monthly reports supports a finding of bad faith. However, as discussed above, DOC's interpretation of Gronquist's request was reasonable, and Gronquist had the opportunity to clarify his request but he did not. Any failure to produce documents as a result of this "narrow interpretation" can be traced to miscommunication and misunderstanding, not bad faith.

Finally, Gronquist argues in his reply brief that DOC's failure to conduct an adequate search points to bad faith, as DOC could act with utter indifference to an inmate's request without consequence due to the high threshold for penalties. He contends that the heightened standard for bad faith gives agencies little incentive to take inmate requests seriously, and that this leeway allows DOC to continuously violate the PRA with minimal consequences. We do not consider this policy argument, as it was raised for the first time in a reply brief. *Ainsworth v. Progressive Cas. Ins. Co*, 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014).

Moreover, these policy arguments are more properly directed to the legislature. It was the legislature that elected, in its wisdom, to include the requirement that inmate requestors must demonstrate bad faith on the part of the agency in order to secure penalties under the PRA. Had Gronquist appealed to DOC or otherwise communicated with it directly, it is possible that he could have received the records sooner, and without needing to resort to litigation. He did not give DOC

this chance.[10] By not giving DOC a chance to cure its mistakes before proceeding to litigation, Gronquist made it difficult to evaluate whether the failure to provide documents was a result of bad faith or simply miscommunication and human error.[11] In fact, DOC's diligence in fulfilling the records request throughout the litigation shows that it *was* willing to produce these records, but that it simply did not know that it had not produced all of the responsive records.

We affirm the trial court's conclusion that Gronquist did not prove that DOC acted in bad faith.

### III. MOTION FOR RECONSIDERATION AND REQUEST FOR ADDITIONAL DISCOVERY

Gronquist moved for reconsideration of the trial court's decision on the basis that DOC produced additional records between the time of the trial court's oral ruling and the entry of its final order, and also asked for an additional six weeks to conduct discovery on the circumstances of the disclosure. The court denied this request, as well as the motion to reconsider, concluding that the issue of the late production of documents was germane to the underlying PRA violation rather than the issue of bad faith, and that there was no new information that would cause the court to reconsider its decision. Gronquist challenges the denial of his motion to reconsider and request for additional time to conduct discovery.

---

[10] As this court opined in *Hobbs*: "As a policy matter, the purpose of the PRA is best served by communication between agencies and requesters, not by playing 'gotcha' with litigation." *Hobbs*, 183 Wn. App. at 941 n.12.

[11] This is not to say that a requestor is required to exhaust all other avenues before proceeding to litigation, or that bad faith cannot be established if a requestor did not adequately communicate with the relevant agency. In this case, however, Gronquist's failure to inform DOC that his request remained unfulfilled makes it difficult to prove that DOC's inadequate search was a result of bad faith, rather than simple miscommunication or negligence.

A. Legal Principles

A trial court may grant reconsideration if the moving party introduces "[n]ewly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial." CR 59(a)(4). We review a trial court's order on reconsideration for manifest abuse of discretion. *West v. Dep't of Licensing*, 182 Wn. App. 500, 516, 331 P.3d 72 (2014). In addition, we review a trial court's discovery orders for an abuse of discretion. *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *Id*.

B. Application

Gronquist claims that the final production of responsive records, which occurred after the trial court's initial ruling, points to bad faith, and that the trial court erred in denying him the opportunity to conduct further discovery into this final production. Gronquist argues that the timing of the final production of records is suspicious, and that additional discovery would produce evidence to show that these records were withheld in bad faith, but he does not provide any reasoning as to why this new information would change the court's analysis beyond rehashing the speculative arguments that he had already made. If the records were withheld in bad faith from the outset, he likely could have found some evidence of this in the original discovery, or at least by the time the trial court reconsidered its original ruling sua sponte. The trial court rejected Gronquist's request because it had "carefully considered the issues presented, not once or even twice, but now three times," and there was no new information that would provide a basis for further reconsideration. VRP (Apr. 14, 2023) at 3. This is not a manifestly unreasonable justification for not reopening discovery, and the trial court did not, therefore, abuse its discretion.

Gronquist further argues that because he was unable to conduct further discovery, the trial court could not have considered his motion for reconsideration de novo, as "[i]t is impossible to conduct a full and independent review of an incomplete record." Br. of Appellant at 66. However, Gronquist did not advise the court what information he believed further discovery would yield that was not already available to the court. We reject Gronquist's argument that the trial court erred in denying his motion for reconsideration and request for additional discovery.

## IV. ATTORNEY FEES AWARDED BELOW

Gronquist requests in his reply brief that if we find that DOC acted in bad faith, it should remand the issue of attorney fees to the trial court for a "fresh analysis." Reply Br. of Appellant at 64. First, we have already concluded that the department did not act in bad faith. Second, we need not consider this argument, as it was raised for the first time in a reply brief.[12]

DOC argues that we should reverse the attorney fees awarded below on the basis of its argument that it did not, in fact, violate the PRA. However, we find that DOC did, in fact, violate the PRA, so this argument is moot.

The PRA states that

[a]ny person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record or the right to receive a response to a public record request within a reasonable amount of time shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action.

RCW 42.56.550(4). Outside of the context of inmate requestors, attorney fees are available when a party successfully proves that an agency violated the PRA, regardless of whether that party is also entitled to penalties. *City of Lakewood v. Koenig*, 182 Wn.2d 87, 97-99, 343 P.3d 335 (2014).

---

[12] An appellate court does not consider issues raised for the first time in a reply brief. *Ainsworth,* 180 Wn. App. at 78 n.20.

Precedent is less clear on whether an inmate requestor is entitled to attorney fees absent a finding that the agency acted in bad faith, as RCW 42.56.550 does not reflect the unique burden that inmate requestors carry to prevail in a PRA action. However, DOC did not argue at the trial court that Gronquist was not the prevailing party on the basis that he did not show bad faith. Rather, it only argued that it did not violate the PRA, and thus any attorney fees awarded on the basis of a PRA violation should be reversed. Because we agree with the trial court that DOC violated the PRA, and DOC failed to argue that Gronquist should not be entitled to the attorney fees he was awarded below *even if* it violated the PRA because Gronquist did not show that DOC acted in bad faith, we decline to reverse the attorney fee award at the trial court.

## V. ATTORNEY FEES ON APPEAL

Gronquist requests that we award him reasonable attorney fees on appeal. RCW 42.56.550(4) entitles a prevailing party to reasonable costs and fees incurred in bringing the action, including on appeal. *PAWS*, 125 Wn.2d at 271. However, Gronquist failed to devote a separate section of his opening brief to this request, as required by RAP 18.1(b). As such, we deny Gronquist's request for attorney fees on appeal.

## CONCLUSION

We hold that DOC violated the PRA in its response to Gronquist's PRA request. However, Gronquist fails to show that DOC acted in bad faith in responding to his request, and as such we decline to remand this case to the trial court to determine penalties. We affirm the attorney fee award to Gronquist for the trial court proceedings, but decline his request for attorney fees on appeal.

26

No. 58808-1-II

CRUSER, C.J.

We concur:

MAXA, J.

LEE, J.